Filed 5/29/26  P. v. Vuletic CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051214 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 23CR001740) |
| v. | |
| MIODRAG VULETIC, | |
| Defendant and Appellant. | |

In 2023, Miodrag Vuletic was convicted of 28 counts of sexual abuse involving three children and sentenced to a total of 95 years to life in prison.  In this appeal, Vuletic challenges on several grounds the testimony of the prosecution's expert on Child Sexual Abuse Accommodation Syndrome (CSAAS) as well as three jury instructions.  As explained below, we find no error or abuse of discretion and therefore affirm the judgment.

## I. BACKGROUND

### A. The Underlying Conduct

At the time of trial, Vuletic was 71 years old.  He owned an auto repair shop and occasionally let F.V., a friend, work there.  (To protect the privacy of the victims, we use initials to refer to their fathers.  (See Cal. Rules of Court, rule 8.90(b)(4), (11).))  F.V. was the father of two young girls, Jane Doe 1 and Jane Doe 2, who were born in 2008 and

2010 respectively. J.M. also was a long-time friend of Vuletic, and he had a young daughter, Jane Doe 3, who was born in 2011. Both F.V. and J.M. frequently allowed Vuletic to interact with their daughters.

In addition to paying F.V. for his work at the auto repair shop, Vuletic occasionally paid F.V.'s bills or lent him money. F.V.'s wife also occasionally worked for Vuletic, and Vuletic often took the whole family out for lunch or dinner. Vuletic treated F.V.'s daughters like grandchildren, buying them presents such as bikes, a scooter, and video games, and when F.V. worked at Vuletic's shop, he often brought Jane Doe 1 and Jane Doe 2, who would go to Vuletic's office, play games with him, play on his computer, walk his dog with him, or go with him to a small group of trees near the shop.

One evening in December 2020, F.V. and Jane Doe 2 were at Vuletic's shop when F.V. noticed that his daughter was not in Vuletic's office and looked for her. He found her with Vuletic in a camper van, playing a computer game on Vuletic's phone. Vuletic's face was close to Jane Doe 2's as if he were about to kiss her, and her jacket was rippling as if he were touching her. F.V. yelled his daughter's name, and Vuletic backed away. F.V. then approached his daughter and asked if Vuletic had been touching her under her jacket. Jane Doe 2 said yes. Vuletic was silent.

After F.V. returned home, he asked his older daughter, Jane Doe 1, if Vuletic had been touching her. Jane Doe 1 said yes. Several days later, F.V. reported the abuse to the police.

Around the same time, F.V. contacted J.M., who had a daughter, Jane Doe 3, a year younger than Jane Doe 2. Like F.V., J.M. sometimes would go to F.V.'s auto repair shop and bring his daughter, who would play with Jane Doe 1 and Jane Doe 2 if they were there. Otherwise Jane Doe 3 would play with Vuletic on his computer and look at the high-end cars in his shop.

2

After J.M. separated from Jane Doe 3's mother, Vuletic began to come over to J.M.'s house out of the blue and say he wanted to watch a movie or have dinner. Vuletic would do so when J.M. had Jane Doe 3 and her brother, and Vuletic would bring a cake or candy for the children. When Vuletic would watch movies with J.M. and his children, he would sit next to Jane Doe 3. On several occasions when Vuletic visited, J.M. noticed that Jane Doe 3 acted strangely, one time staying unusually close to J.M. and another lying underneath a coffee table while watching television.

When F.V. told J.M. what Vuletic had been doing to Jane Doe 1 and Jane Doe 2, J.M. asked Jane Doe 3 whether Vuletic had done anything to her. Initially Jane Doe 3 said no. However, after J.M. urged her to be honest, Jane Doe 3 quickly said yes. J.M. then contacted the police.

## B. The Charges

In December 2020, the police interviewed Jane Doe 1 and Jane Doe 2. Vuletic was arrested three months later, and in March 2023 an information charged him with 28 counts of child sexual abuse from October 2017 to December 2020. Specifically, Vuletic was charged with 23 counts of committing a lewd act on a child in violation of Penal Code section 288, subdivision (a); two counts of forcible lewd acts in violation of Penal Code section 288, subdivision (b)(1); and three counts of oral copulation in violation of Penal Code section 288.7, subdivision (b).

## C. The Trial

Trial began in May 2023 and lasted for five days. (Vuletic represents that there was an earlier trial which ended with a hung jury, but there does not appear to be any evidence of the earlier trial in the record.)

### 1. The Evidence of Abuse

The prosecution's primary witnesses were Jane Doe 1, Jane Doe 2, and Jane Doe 3. The three described numerous instances of molestation and abuse. Jane Doe 1

3

testified that Vuletic began touching her inappropriately in May or June 2020, when she was 12 years old. She described numerous instances of improper touching, which included rubbing her breasts. Jane Doe 2 testified that Vuletic began inappropriately touching her even earlier, starting in 2018. She recounted numerous instances in which Vuletic put his hand down her pants and below her underwear, and touched her breast. She testified as well that on at least five occasions Vuletic orally copulated her when she was climbing on the trees near his shop. And she recounted the incident in which she was in the camper van: Jane Doe 2 testified that, while she was playing a computer game, Vuletic rubbed her breast below her shirt and that she was relieved when her father yelled for her because she wanted Vuletic to stop. Finally, Jane Doe 3 testified that when she would watch a movie with Vuletic, he would sit near her and rub her private part.

The prosecution presented testimony from other witnesses about Vuletic's abuse. It presented testimony from F.V. in a prior proceeding about the camper van incident. The prosecution also presented testimony from F.V. that Jane Doe 1 revealed that Vuletic had been touching her as well. J.M. testified concerning the incidents in which Jane Doe 3's unusual behavior made him suspicious of Vuletic and about Jane Doe 3's disclosure that Vuletic had been touching her after F.V. contacted him. Finally, the prosecution presented testimony from the owner of a restaurant where F.V.'s family often ate. In 2013 or 2014, when Jane Doe 1 was five or six, Vuletic accompanied the family to the restaurant, and while her mother went to the restroom, the owner observed Vuletic sit Jane Doe 1 on his legs and stick his hand up her shirt and down her pants. The owner warned F.V. to take care of his daughters, which shocked F.V. However, the family returned frequently with Vuletic, and Vuletic continued to touch and kiss the girls.

### 2. Suggestibility and CSAAS Testimony

Because some of the prosecution's witnesses were unavailable, Vuletic presented several witnesses out of order, including Dr. Bradley McAuliff, an expert on

4

suggestibility and forensic interviewing techniques for children. Dr. McAuliff testified that suggestion can lead children to believe falsely that they were sexually assaulted, though he acknowledged that it was difficult to do so and even harder as children grow older. Dr. McAuliff emphasized that children may defer to adults, especially in stressful situations, and leading questions can shift their memories. Dr. McAuliff also testified that one of the officers who interviewed Jane Doe 1 and Jane Doe 2 used suggestive techniques such as raising the issue of copulation with Jane Doe 2 and repeatedly asked whether Vuletic had made her feel uncomfortable. However, on cross-examination, Dr. McAuliff acknowledged that during their first interviews with a police officer Jane Doe 1 and Jane Doe 2 disclosed Vuletic's improperly touching them before any suggestion by the officers of such conduct. In addition, he acknowledged that studies showed that, even with preschool-aged children, "only a minority" were willing to agree to information pushed on them by an interviewer, and that "most children reject false information."

Dr. Blake Carmichael testified for the prosecution as an expert on CSAAS, though the prosecution did not use the term and instead described him as an expert on "the psychological effects of child sexual assault." Dr. Carmichael explained that he did not know Vuletic or the alleged victims, had not read reports about the case, and was not offering any opinion on whether Vuletic had actually assaulted anyone. Instead, Dr. Carmichael discussed child sexual assault victims in general. Based on his clinical experience and review of relevant studies, he said that children who have been sexually abused often delay disclosure of the abuse, sometimes because they know and trust the abuser, or because the abuser has power over them. In addition, Dr. Carmichael continued, child sexual assault victims sometimes disclose abuse bit by bit rather than all at once, to evaluate the reaction of the person to whom they are revealing the abuse.

Finally, Dr. Carmichael noted that children may forget or mix up specific details, but do so less often with "core" details such as abusive touching or fear that they felt.

The prosecution also asked Dr. Carmichael about suggestibility. Dr. Carmichael acknowledged that asking a question in a certain way may make a person more likely to agree to something that did not actually happen. However, he noted that it is easier to trick a person into agreeing to something that is a positive event and that the person has actually experienced; it is harder, Dr. Carmichael continued, to lead a person to agree to a negative event that they never experienced. Dr. Carmichael also noted that it is harder to suggest incorrect information about core details and that around the age of five or six years suggestibility significantly declines.

### 3. Other Defense Witnesses

In his defense, Vuletic presented nine character witnesses. Vuletic's ex-wife testified that it was against his character to sexually abuse children, and Vuletic's landlord testified that he was honest and would not assault children. The remaining seven witnesses, two friends and five workers from nearby businesses, testified that they had seen Vuletic interact with Jane Doe 1 and Jane Doe 2, and nothing caused them concern for the girls. Vuletic also presented testimony from the first police officer who interviewed Jane Doe 1 and Jane Doe 2, who admitted to making several suggestive statements during the interviews.

Finally, Vuletic took the stand himself. He denied inappropriately touching any of the three complaining witnesses. He also testified that he was generous to F.V. and his daughters, lending money to F.V., paying him to do side jobs, and buying clothes and other items for his daughters. However, Vuletic further testified, in late 2020, shortly before the camper van incident, he ignored a request for money from F.V., which upset F.V.

6

### 4. *Verdict and Sentence*

The jury deliberated for less than a day. It convicted Vuletic on all counts.

On July 20, 2023, the trial court sentenced Vuletic to consecutive terms of 15 years to life on two counts of committing a lewd act on a child; consecutive terms of 25 years to life on two counts of committing forcible lewd acts; and one consecutive term of 15 years to life for oral copulation. The sentences for the remaining 23 counts were similar but concurrent. The total term was 95 years to life.

Vuletic filed a notice of appeal the day of his sentencing.

## II. Discussion

On appeal, Vuletic challenges Dr. Carmichael's testimony on three grounds and challenges three jury instructions. Below, we address each of these challenges as well as Vuletic's assertion concerning the cumulative effect of the trial court's alleged errors.

## A. Dr. Carmichael's Testimony

Vuletic argues that Dr. Carmichael's CSAAS testimony should have been excluded under the "*Kelly-Frye*" test (see *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), abrogated by statute on another point as explained in *People v. Wilkinson* (2004) 33 Cal.4th 821, 845-848; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*)) or, alternatively, under Evidence Code section 352. (Because the federal courts no longer follow the *Frye* decision, and the Supreme Court has observed that "our state law rule is now referred to simply as the *Kelly* test or rule" (*People v. Bolden* (2002) 29 Cal.4th 515, 545), the rest of this opinion will refer to the *Kelly* test.) Additionally, Vuletic argues that he received ineffective assistance of counsel because his trial counsel failed to challenge Vuletic's testimony concerning suggestibility. These arguments are unpersuasive.

### 1. *The Kelly Test*

In one sentence in the motions in limine in his trial brief, Vuletic asserted that CSAAS does not satisfy the *Kelly* test. Vuletic now contends that trial court erred in

failing to apply this test, an issue that we review de novo. (See, e.g., *People v. Lapenias* (2021) 67 Cal.App.5th 162, 170 (*Lapenias*).) Even if it is assumed that the brief allusion to the *Kelly* test in his trial brief sufficiently raised the issue, Vuletic's reliance is misplaced because the *Kelly* test applies only to scientific evidence and, as every court to consider the issue has concluded, CSAAS is not scientific evidence under *Kelly*.

The Supreme Court has distinguished between ordinary " 'expert opinion' " and "new 'scientific' evidence," which is subject to the "special restrictions" in the *Kelly* test. (*People v. Stoll* (1989) 49 Cal.3d 1136, 1140-1141 (*Stoll*).) Under this test, evidence concerning a new method of scientific proof is admissible only if three things are established: "(1) 'the technique is generally accepted as reliable in the relevant scientific community'; (2) 'the witness testifying about the technique and its application is a properly qualified expert on the subject'; and (3) 'the person performing the test in the particular case used the correct scientific procedures.' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 441 (*Alvarez*).) " '[T]he purpose of the *Kelly* test 'is to protect against the risk of credulous juries attributing to evidence cloaked in scientific terminology an aura of infallibility.' " (*Id*. at p. 443.) This danger arises when a technique or procedure seems to provide a "definitive truth[,] which the expert need only accurately recognize and relay to the jury." (*Stoll*, at p. 1156.) The most obvious examples are "machines or procedures which analyze physical data" and may be viewed as "objective and infallible." (*Ibid*. But see *ibid*. ["[N]othing precludes [the *Kelly* test's] application to 'a new scientific process operating on purely psychological evidence' "].)

The *Kelly* test applies only to a " ' "limited class of expert testimony." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 470.) " '[A]bsent some special feature, which effectively blindsides the jury, expert testimony is not subject to *Kelly* . . . .' " (*Alvarez*, *supra*, 18 Cal.5th at p. 441.) Thus, expert testimony is not subject to the *Kelly* test merely because it involves scientific techniques or testing. For example, in *People v. Stoll*,

8

*supra*, 49 Cal.3d 1136, the Supreme Court considered a psychologist who testified that a defendant was not disposed towards lewd or incestuous acts based in part on psychological tests. (See *id*. at pp. 1146-1147.) The Supreme Court held that the psychologist's testimony was not subject to the *Kelly* test, reasoning that the psychologist's methods "carry no misleading aura of scientific infallibility" because, among other things, the testing employed by the psychologist was merely "a springboard for a far more normative and subjective diagnostic process." (*Id*. at pp. 1157, 1159.) In *People v. Alvarez*, *supra*, 18 Cal.5th 387, the Supreme Court similarly held that a psychologist's testimony concerning the risk that an individual would abuse children in her care was not subject to the *Kelly* test even though that conclusion was based in part on the result of a test. (*Alvarez*, at pp. 438-440, 442-443.)

Dr. Carmichael's CSAAS testimony is not subject to the *Kelly* test either. CSAAS is not new; indeed, the Supreme Court approved such testimony more than three decades ago. (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).) Even more important, CSAAS does not provide any " 'definitive truth' " that is cloaked in " 'an aura of infallibility.' " (*Alvarez*, *supra*, 18 Cal.5th at p. 441.) Instead, CSAAS explains " 'the emotional antecedents of abused children's seemingly self-impeaching behavior' " such as "delay in reporting." (*McAlpin*, at pp. 1300-1301.) Moreover, Dr. Carmichael, who did not know any of the parties involved in this matter and did not review the case files, testified only about child sexual assault victims in general and offered no opinion about the alleged victims in this case. As a consequence, Dr. Carmichael's CSAAS testimony lacked any "special feature" warranting application of the *Kelly* test. (See *Stoll*, *supra*, 49 Cal.3d at p. 1157.)

Other decisions have reached the same conclusion. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 173 [holding the *Kelly* test inapplicable to CSAAS testimony because "[t]he theory of CSAAS is not new" and "CSAAS testimony does not purport to provide

9

a definitive truth"]; *People v Munch* (2020) 52 Cal.App.5th 464, 473 (*Munch*) [holding the *Kelly* test inapplicable to CSAAS testimony because the testimony was based on the expert's " 'clinical experience with child sexual abuse victims' " and " 'familiarity with professional literature in the area' "]; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449 [same]; *People v. Gray* (1986) 187 Cal.App.3d 213, 220 [holding *Kelly* test inapplicable because CSAAS testimony did not involve any method creating an aura of infallibility].)

Vuletic fails to cite any decision disagreeing with this precedent or to provide any persuasive reason to depart from it. He asserts that the *Kelly* test applies here because Dr. Carmichael's testimony uses "scientific methodology." But the mere fact that an expert uses scientific methodology is not sufficient to trigger application of the *Kelly* test: As noted above, the Supreme Court held that the test did not apply to the testimony of the expert psychologists in *Stoll* or *Alvarez* even though both used standardized tests, a "scientific methodology." (See *Alvarez*, *supra*, 18 Cal.5th at pp. 442-443; *Stoll*, *supra*, 49 Cal.3d at pp. 1157, 1159.) Vuletic also asserts that Dr. Carmichael's testimony had a "misleading scientific appearance" and that the *Kelly* test's purpose is "to protect the jury from scientific methodology, which, though new and experimental, conveys to the jury a misleading aura of certainty." Vuletic's concern appears to be that Dr. Carmichael's testimony might have been used as "a tool to diagnose molestation" and "validate[] the truthfulness of the complaining witnesses' testimony." However, as noted above, Dr. Carmichael expressly testified that he was testifying about child sexual assault victims in general and *not* providing an opinion about whether the complaining witnesses were abused. Moreover, Vuletic does not point to anything in Dr. Carmichael's testimony that the jury could have interpreted as providing a tool to diagnose molestation or validate the truthfulness of the complaining witnesses' testimony. As a consequence, he has failed to show that Dr. Carmichael's testimony purported to offer definitive proof of anything, much less with the aura of infallibility against which the *Kelly* test is intended to protect.

10

We therefore conclude that Vuletic has failed to show that the *Kelly* test applies and Dr. Carmichael's testimony should not have been excluded under the test.

## 2. *Evidence Code Section 352*

Vuletic also contends Dr. Carmichael's testimony was improperly admitted under Evidence Code section 352. We find no abuse of discretion. (See, e.g., *People v. McKinnon* (2011) 52 Cal.4th 610, 655 ["On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible."].)

Under Evidence Code section 352, a trial court may exclude evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Vuletic asserts that Dr. Carmichael's testimony lacks any probative value because the prosecution failed to establish general scientific acceptance of CSAAS and also that there was a high "danger of the jury misusing this evidence" because "CSAAS appears as a scientific technique, not as a set of therapeutic observations." However, despite the absence of evidence of general scientific acceptance courts have long recognized that CSAAS is useful "to explain the emotional antecedents of abused children's seemingly self-impeaching behavior" such as "delay in reporting." (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301, fn. 4; see also *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744; *People v. Bowker* (1988) 203 Cal.App.3d 385, 392.) In addition, Vuletic fails to explain how CSAAS "appears as a scientific technique," much less how doing so creates a danger of undue prejudice, confusing the issues, or misleading the jury that substantially outweighs the probative value of Dr. Carmichael's testimony.

We therefore conclude that the trial court did not abuse its discretion in admitting CSAAS testimony under Evidence Code section 352. In addition, because Dr. Carmichael's testimony was properly admitted, we conclude that Vuletic has not

11

shown that his trial was fundamentally unfair and therefore reject his due process arguments.

### 3. Suggestibility

Vuletic presented testimony from Dr. Bradley McAuliff, an expert on child suggestibility, that police officers, their parents, or others may have led the complaining witnesses to believe falsely that they were sexually abused. When Dr. Carmichael testified, he responded to Dr. McAuliff's testimony. While acknowledging that it is possible to lead someone into agreeing that an event occurred that did not actually happen, Dr. Carmichael testified that this was "[h]arder to do on negative events and things you're just not familiar with or never experienced in your life." Dr. Carmichael also testified that "preschool-aged kids are more suggestible than their older counterparts"—such as the alleged victims in this case—and that "core details are harder to . . . suggest or implant" than peripheral ones. Because Vuletic's trial counsel did not object to Dr. Carmichael's testimony on suggestibility, Vuletic argues on appeal that counsel rendered ineffective assistance of counsel.

### a. Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, a defendant must establish two things: (1) counsel's performance was deficient and (2) this deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) A counsel's performance is deficient if it "fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) However, judicial review of counsel's performance is "highly deferential," and courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689; see also *People v. Weaver* (2001) 26 Cal.4th 876, 925 [" 'there is a "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance" ' "].) In addition, to establish prejudice, a defendant

must show "a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)

      b.  <u>Performance</u>

Vuletic contends trial counsel should have challenged Dr. Carmichael's testimony based on three decisions—*Lapenias*, *supra*, 67 Cal.App.5th 162; *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*); and *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*)—holding it improper for CSAAS experts to testify that children rarely make false allegations of abuse. However, in the challenged testimony, Dr. Carmichael testified about suggestibility, not how often children make false accusations. As a consequence, it was reasonable for Vuletic's counsel to conclude that the decisions invoked by Vuletic are distinguishable and, because there are no clear alternative grounds for objecting to Dr. Carmichael's suggestibility testimony, to refrain from objecting to the testimony.

Because, as noted above, judicial review of counsel's conduct is "highly deferential" and courts presume that such conduct "falls within the wide range of reasonable professional assistance" (*Strickland*, *supra*, 466 U.S. at p. 689), reviewing courts generally " 'will not second-guess trial counsel's reasonable tactical decisions.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1185 (*Riel*).) In addition, because " '[d]eciding whether to object is inherently tactical, . . . the failure to object will rarely establish ineffective assistance.' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1290; see also *Riel*, at p. 1185 ["Generally, failure to object is a matter as to which we will not exercise judicial hindsight . . . ."]; *People v Ghent* (1987) 43 Cal.3d 739, 772 ["mere failure to object to evidence or argument seldom establishes counsel's incompetence"].)

Although Vuletic's trial counsel should have been aware of the decisions concerning CSAAS testimony such as *Wilson*, *Julian*, and *Lapenias*, he reasonably could

have concluded that these cases were inapposite. In *Wilson*, expressly stepping " 'outside . . . the accommodation syndrome,' " an expert testified that false allegations of child sexual abuse occur " 'very infrequently or rarely' " and that studies of the issue had "found false allegations in between 1 and 6 percent of cases." (*Wilson*, *supra*, 33 Cal.App.5th at p. 568.) The Court of Appeal held this testimony inadmissible because, by suggesting that there was at least a 94 percent chance that any child who claimed to have been sexually abused was telling the truth, the expert "invaded the province of the jury, whose responsibility is to 'draw the ultimate inferences from the evidence.' " (*Id*. at p. 570.) In addition, citing the Supreme Court's noted decision in *People v. Collins* (1968) 68 Cal.2d 319, the court observed that the jury should evaluate the testimony of the alleged victims, together with all other evidence, "without statistical evidence placing a thumb on the scale for guilt." (*Wilson*, at p. 571.)

*Julian* and *Lapenias* held similarly. In *Julian*, an expert testified that false allegations by children " 'don't happen very often' " and that the frequency of false allegations was "as low as one percent of cases to a high of maybe 6, 7, 8 percent." (*Julian*, *supra*, 34 Cal.App.5th at p. 882 (italics omitted).) The Court of Appeal held that it was improper for the expert " 'to give an opinion on whether a witness is telling the truth' " or to "invite[] jurors to presume Julian was guilty based on statistical probability." (*Id*. at p. 885, 886.) In *Lapenias*, the expert (Dr. Carmichael) did not offer any statistics concerning how often children make false allegations of sexual abuse, but in response to a question from the jury he testified that " 'it's rare for kids to make a false claim of sexual abuse.' " (*Lapenias*, *supra*, 67 Cal.App.4th at p. 177.) Relying on *Wilson* and *Julian*, the Court of Appeal held inadmissible testimony that false allegations are rare because such testimony "violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Id*. at p. 179; see also *id*. at pp. 178-179 [relying on *Wilson* and *Julian*].)

14

Vuletic's trial counsel reasonably could have concluded that this case is distinguishable. Here, although Dr. Carmichael opined about how frequently sexual abuse allegations by children are created by suggestion, he did not offer any opinion on the ultimate issue of how often children make false allegations of sexual abuse. As a consequence, he did not "plac[e] a thumb on the scale of guilt" (*Wilson*, *supra*, 33 Cal.App.5th at p. 571), "invite[] jurors to presume [the defendant] was guilty based on statistical probability" (*Julian*, *supra*, 34 Cal.App.5th at p. 886), or otherwise "give an opinion as to whether another witness is telling the truth or the defendant is guilty" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179). He merely offered testimony that, like CSAAS testimony, casts light on issues concerning the credibility of the complaining witnesses' testimony and Dr. McAuliff's testimony concerning that credibility. If Dr. McAuliff's testimony was admissible—which Vuletic's counsel presumably believed in deciding to present that testimony—Cunningham's response presumably was as well.

Indeed, in a recent decision, the Court of Appeal for the Fifth District reached a similar conclusion. In *People v. Sedano* (2023) 88 Cal.App.5th 474 (*Sedano*), a CSAAS expert testified about the symptoms most typically displayed by children who have been sexually molested, including that 94 percent of the children in one study had a pre-existing relationship with the molester and that 74 percent did not disclose the abuse within a year and 50 percent had not done so after five years. (*Id*. at p. 478.) On appeal, much like Vuletic relying on *Wilson, Julian*, and *Lapenias*, the defendant argued that this statistical evidence improperly bolstered the complaining witness' testimony. (*Id*. at pp. 480-481.) The Fifth District disagreed. (*Id*. at pp. 481-484.) It reasoned that the statistics offered by the expert did not convey a conclusion about the defendant's guilt and merely helped the jury to evaluate the credibility of the alleged child victim. (*Id*. at p. 481.) In so doing, the Fifth District expressly distinguished *Wilson* and *Julian*, noting that the problem in those cases "was not that the CSAAS expert used statistics in his

testimony but that he used statistics conveying that complainants almost always tell the truth." (*Id*. at p. 481, italics omitted.) The statistics offered by the expert in *Sedano*, the Court of Appeal continued, "did not invite the jury to infer guilt on probability alone" and therefore did not cross the line that the experts in *Wilson* and *Julian* crossed. (*Id*. at p. 482.)

It was neither unreasonable nor deficient for Vuletic's counsel to conclude that Dr. Carmichael's testimony concerning suggestibility was similarly admissible and therefore to refrain from objecting to the testimony. (See, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."].)

### c. Prejudice

Even if Vuletic's trial counsel was somehow deficient in not objecting to Dr. Carmichael's testimony concerning suggestibility, there is no reasonable probability that Vuletic would have obtained a more favorable result had he done so. Indeed, the testimony from Dr. Carmichael about which Vuletic objects on appeal is virtually identical to testimony that his own expert Dr. McAuliff offered.

Vuletic notes in his opening brief that Dr. Carmichael testified that it is "much easier to suggest an answer by asking a child a question about a positive event that actually happened to them" and that it is "much harder" and "unlikely" to suggest "a negative event that is uncommon or never happened to a child." Vuletic also paraphrases testimony from Dr. Carmichael that "preschool age children are easier to trick than their older counterparts," and therefore it is "much harder" and "unlikely" to get older children to falsely agree to an implausible negative event. Finally, Vuletic paraphrases Dr. Carmichael's testimony that leading or repeated questions should be avoided in forensic interviews but that "asking them does not make what the kid says [in response] untrue."

16

This testimony is not meaningfully different from Dr. McAuliff's. Indeed, in some ways, Dr. McAuliff's testimony was more pointed. For example, while Dr. Carmichael testified that it is harder to suggest "negative events," Dr. McAuliff testified that "it is hard to lead a child to believe . . . they were sexually abused." In addition, like Dr. Carmichael, Dr. McAuliff agreed that "the older a child gets, as a general term, the more durable their memory becomes," and they have greater "ability to resist suggestion." Dr. McAuliff agreed as well that, even with preschool-aged children, "only a minority" are willing to agree to an interviewer's suggestions. Finally, Dr. McAuliff conceded that the "presence of some factors of suggestibility" does not mean "automatically you have a false accusation or disclosure."

Given that Dr. McAuliff largely if not entirely admitted the points made by Dr. Carmichael to which Vuletic now objects, it is unlikely that exclusion of Dr. Carmichael's testimony on these points would have altered the jury's verdict. At oral argument Vuletic contended that Dr. Carmichael's testimony was nonetheless prejudicial because Dr. McAuliff's testimony was more general, and unlike Dr. McAuliff, Dr. Carmichael opined about the likelihood that suggestion produced a child's memory. In fact, Dr. McAuliff's testimony was specific to this case. Far from testifying about suggestibility in general, Dr. McAuliff agreed that "it is possible that a child can believe they are a victim through sexual assault by something that has been suggested to them," and he testified as well that "it is harder to get a child to believe . . . they were sexually abused than to believe other parts of an action." Contrary to Vuletic's assertion, Dr. McAuliff also testified about the likelihood of such suggestion: He said that "only a minority" of preschool-aged children were willing to accept suggestions and that "most" children reject false information. Dr. Carmichael's testimony was more general: He merely noted that it was "[m]uch more difficult" and "much more challenging" to suggest

17

a negative event to older children and, contrary to Vuletic's assertion, never said that such suggestion was "unlikely."

In his briefs and at oral argument, Vuletic also pointed to the prosecution's use of Dr. Carmichael's testimony in closing argument. There, the prosecution characterized Dr. Carmichael as having asserted that there is "a dramatic decrease" in suggestibility after the age of five or six and that "research" shows suggestibility errors concerning sexual abuse are "incredibly rare." However, Vuletic fails to explain how the prosecution's closing argument demonstrates prejudice from trial counsel's failure to object to Dr. Carmichael's suggestibility testimony—rather than from the failure to object to the closing argument, which Vuletic has not challenged.

We therefore conclude that, in addition to failing to show deficient performance, Vuletic has failed to show prejudice from trial counsel's failure to challenge Dr. Carmichael's testimony concerning suggestibility. Accordingly, we reject Vuletic's assertion of ineffective assistance of counsel.

## B. Instructional Error

In addition to challenging Dr. Carmichael's testimony, Vuletic challenges jury instructions concerning (1) CSAAS evidence, (2) consideration of charged offenses, and (3) the complaining witnesses' testimony. Reviewing each challenge de novo (*People v. Mitchell* (2019) 7 Cal.5th 561, 579), we conclude there was no error.

### 1. CALCRIM No. 1193

Vuletic contends that the trial court erred by instructing the jury with a modified version of the standard instruction on CSAAS evidence, CALCRIM No. 1193. In Vuletic's view, this instruction allowed the jury to consider Dr. Carmichael's testimony as "circumstantial evidence" that the complaining witnesses' allegations were true. Although Vuletic did not adequately object to the instruction at trial, we nonetheless consider this claim because he contends that the instruction was erroneous and affected

18

his substantial rights. (See *People v. Gomez* (2018) 6 Cal.5th 243, 273; *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815 (*Ortiz*).) We conclude there was no error.

CALCRIM No. 1193 states that CSAAS testimony is "not evidence that the defendant committed any of the crimes charged against [him]," but may be considered "only" in determining whether a witness's conduct was "not inconsistent" with having been abused. (CALCRIM No. 1193 (2024 ed.).) Omitting the standard instruction's reference to CSAAS and adding the names of the expert and complaining witnesses, the trial court instructed the jury: "You have heard testimony from Dr. Blake Carmichael regarding the psychological aspects of child sexual abuse. [¶] Testimony regarding the psychological aspects of child sexual abuse is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Jane Doe 1, Jane Doe 2 or Jane Doe 3's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony."

This instruction accurately advised the jury on CSAAS. "The purpose of CSAAS is to understand a child's reactions when they have been abused." (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 504 (*Gonzales*).) As previously noted, CSAAS testimony helps to explain " 'the emotional antecedents of abused children's seeming self-impeaching behavior' " such as delayed or incomplete reporting and disabuse jurors of common misconceptions about victims of child sexual abuse. (*McAlpin*, *supra*, 53 Cal.3d at p. 1301.) Accordingly, "[w]hile CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 171.) CALCRIM No. 1193 conveys both points by informing the jury that CSAAS testimony is "not evidence that the Defendant committed any of the crimes charges," but it may be considered in

19

deciding whether a witnesses' conduct "was not inconsistent with the conduct of someone who has been molested" and also in assessing "the believability of their testimony." Consequently, courts repeatedly have upheld CALCRIM No. 1193. (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 219; *Ortiz*, *supra*, 96 Cal.App.5th at p. 816; *Lapenias*, *supra*, 67 Cal.App.5th at pp. 175-176; *Munch*, *supra*, 52 Cal.App.5th at p. 474; *Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)

Vuletic objects that the instruction allows jurors "to consider CSAAS evidence as circumstantial proof that molestation has occurred." We disagree. The instruction begins by expressly stating that "[t]estimony regarding the psychological aspects of child sexual abuse is *not* evidence that the Defendant committed any of the crimes charged." (Italics added.) It is true that the instruction later states that such testimony may be used "in evaluating the believability" of the complaining witnesses' testimony." However, in reviewing jury instructions, we assume that " ' " 'jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) In light of the instruction's earlier admonition that CSAAS testimony is not evidence of the commission of a crime, such jurors would not understand this portion of the instruction to authorize them to conclude that the complaining witness was abused based on CSAAS testimony. Instead, they would understand it to mean that CSAAS testimony may be used in assessing credibility and, in particular, to determine that a witness' delay or other seemingly self-impeaching conduct "does not mean she lied when she said that she was abused." (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.) In other words, read intelligently and as a whole, the instruction is understood to mean that "CSAAS evidence simply *neutralizes* the victim's apparently self-impeaching behavior." (*Ibid.*, italics added.)

Accordingly, we conclude the trial court did not err by instructing the jury with CALCRIM No. 1193.

20

### 2. *CALCRIM No. 1191B*

Vuletic also contends the trial court impermissibly lowered the prosecution's burden of proof by instructing the jury with CALCRIM No. 1191B concerning consideration of charged offenses.  As Vuletic concedes, the Supreme Court rejected his argument and expressly approved CALCRIM No. 1191B in *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*).  Although Vuletic argues that *Villatoro* was wrongly decided and should be reconsidered, as Vuletic recognizes, we are bound by the Supreme Court's decision and cannot depart from it.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; see also *People v. Meneses* (2019) 41 Cal.App.5th 63, 68 [rejecting due process challenge to CALCRIM No. 1191B in light of *Villatoro*].)

### 3. *CALCRIM No. 1190*

Finally, Vuletic argues that the trial court erred in giving CALCRIM No. 1190 because that "instruction improperly singles out" the testimony of complaining witnesses "for a special treatment."  Here again, we disagree.  "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, overruled on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756.)  Read in connection with the instructions accompanying it, CALCRIM No. 1190 does not suggest that complaining witnesses should receive special treatment.

CALCRIM No. 1190 states that "[c]onviction of a sexual assault crime may be based on the testimony of the complaining witness alone."  (CALCRIM No. 1190 (2024 ed.).)  The trial court gave this instruction along with CALCRIM No. 301, which provides a similar instruction concerning witnesses in general.  As a consequence, the jury received the following instruction:  "Conviction of a sexual assault crime may be based upon the testimony of a complaining witness alone.  The testimony of only one

witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

In light of the second sentence of the instruction, jurors would not understand the first sentence to single out complaining witnesses for special treatment. Instead, they would understand the first sentence to be a specific application of the more general principle announced in the second sentence: As a general rule, "testimony of only one witness can prove any fact," and, in the specific context of sexual assault crimes "[c]onviction of a sexual assault crime may be based upon the testimony of a complaining witness alone." Indeed, the Supreme Court held that the predecessors of the instructions given the jury—which, it must be noted, were worded somewhat differently and do not appear to have been to have been given so closely together—did not create a preferential standard for complaining witnesses. (*People v. Gammage* (1992) 2 Cal.4th 693, 700-701.)

Vuletic nonetheless asserts that the trial court's instructions singled out complaining witnesses for preferential treatment because the general instruction about a single witness' testimony included a warning to review carefully the evidence before relying on the testimony of one witness while the instruction about complaining witnesses in sexual assault cases did not. However, the jury was not given separate instructions about single witness testimony and about sexual assault complaining witnesses. It was given a single instruction with no indication that its parts should be considered separately. As a consequence, a reasonable juror would have understood the admonition to carefully review all evidence before relying on the testimony of one witness to apply to complaining witnesses as well as other witnesses.

We therefore conclude that there was no error in giving the CALCRIM No. 1190 instruction. In addition, because there was no error in giving this instruction, or the other

22

two challenged by Vuletic, we reject Vuletic's contention that the instructions deprived him of due process.

## C. Cumulative Error

Finally, Vuletic contends that the judgment should be vacated based on the cumulative prejudice from the errors asserted. (See *In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) However, we have found no errors, which means that "there is no prejudice to cumulate." (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391.)

## III. DISPOSITION

The judgment is affirmed.

_____

BROMBERG, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

DANNER, J.

*People v. Vuletic*
H051214